**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **JANAYE MONTGOMERY, *formerly known as* Janaye Todd,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:15-cv-02980-SCJ-AJB** |
| **v.** | : | |
| | : | |
| **GEORGIA POWER COMPANY and THE SOUTHERN COMPANY, *a Foreign Corporation, Jointly and Severally,*** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES MAGISTRATE JUDGE'S ORDER**
**AND FINAL REPORT AND RECOMMENDATION**

In this action, Plaintiff Janaye Montgomery raises claims against Defendants Georgia Power Company ("Georgia Power") and The Southern Company ("Southern Company") for violations of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.* (Compl. [Doc. 1]). Presently before the Court are Defendants' motions for summary judgment, [Doc. 43 (Georgia Power); Doc. 44 (Southern Company)], and Plaintiff's cross motion for summary judgment, [Doc. 48]. For the reasons set forth below, the undersigned **RECOMMENDS** that the District

Judge **DENY** Plaintiff's motion for summary judgment, [Doc. 48], and **GRANT** Defendants' motions for summary judgment, [Docs. 43, 44].

## *I. Legal Standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may also meet its burden by pointing out that there is an absence of evidence to support an element of the case on which the nonmoving party bears the burden of proof. *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*,



AO 72A
(Rev.8/82)

477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). Although "facts must be viewed in the light most favorable to the nonmoving party," this is true "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999). "If the record presents disputed issues of material fact, the Court may not decide them; rather, it must deny the motion and proceed to trial." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001)).



AO 72A
(Rev.8/82)

## II. *Background* [1]

Plaintiff began her employment with Georgia Power on February 20, 1999. (SC ¶ 1; Pl. Resp. SC ¶ 1).[2] Southern Company is a holding company that owns all of

---

[1] In general, the facts considered in this Report and Recommendation ("R&R") are limited to those deemed by the parties to be relevant to the Court's adjudication of the pending motions for summary judgment, [*see* Doc. 43-1; Doc. 44-1; Doc. 48; Doc. 66; Doc. 68-1; Doc. 72; Doc. 74; Doc. 77-1; Doc. 78; Doc. 79]. *See Mendenhall v. Blackmun*, 456 Fed. Appx. 849, 852 (11th Cir. Feb. 6, 2012) (finding it within the district court's discretion to limit its review to the specific portions of the exhibits expressly cited by the parties in their pleadings). However, while the Court need consider only the materials cited in support of the parties' statements of material fact, LR 56.1B, NDGa, it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The facts recited in this section are intended to establish the context of the case. Additional facts will also be recited in the discussion section below.

[2] Paragraph numbers preceded by "GP" refer to Defendant Georgia Power's Statement of Undisputed Material Facts, [Doc. 43-1]; paragraph numbers preceded by "SC" refer to Defendant The Southern Company's Statement of Undisputed Material Facts, [Doc. 44-1]; and paragraph numbers preceded by "P" refer to Plaintiff's Statement of Undisputed Material Facts, [Doc. 66]. Plaintiff's and Defendants' responses to the statements of material fact will be designated as "Pl. Resp. GP," [Doc. 68-1]; "Pl. Resp. SC," [Doc. 77-1]; "GP Resp.," [Doc. 78]; and "SC Resp.," [Doc. 79], respectively. Pursuant to the Local Rules of this Court, each of the proponent's facts will be deemed admitted unless the respondent "(i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2), (3), NDGa. Because Defendants have properly pointed out that Plaintiff's citations do not support facts stated in P ¶¶ 1, 3, 6, 8, 10-11, 14-17, 19-21, 23-26, 28, 33-34, 36-38, 42-44, 47, 50, 52,



AO 72A
(Rev.8/82)

the common stock of certain companies, including Georgia Power and certain electric utilities. (SC ¶ 3; Pl. Resp. SC ¶ 3).

At all times relevant to this case, Plaintiff was employed as a customer service representative working at one of five local offices in Georgia Power's Metro East region. (SC ¶ 23; Pl. Resp. SC ¶ 23; Deposition of Janaye Montgomery ("Pl. Dep.") [Doc. 57] at 158).[3] As a customer service representative working in a local office, Plaintiff was responsible for handling transactions for Georgia Power customers who came to the local office to do things like pay their bills, request electrical service, transfer service, or ask about their service or account. (SC ¶ 24; Pl. Resp. SC ¶ 24). The essential functions of Plaintiff's job included face-to-face interaction with customers, taking payments, and handling Virtual Call Center ("VCC") calls when she

---

54, 59, 61, 64-67, and 71-76; that the facts stated in ¶¶ 17, 22, 30, 31, and 62 rely on hearsay; and that ¶¶ 15, 25, 27, 29, 32, 34, 37-38, 43, 46-48, 51, 54, 56, 64, 66-67, 69-71, 73, and 76 contain legal conclusions and lay opinions improperly stated as facts, the Court **SUSTAINS** those objections. Thus, the statements of fact referenced in this R&R are principally Defendants' statements of material fact, the majority of which have been admitted by Plaintiff. [*See* Doc. 68-1; Doc. 77-1]. In any event, the Court has reviewed all of the cited evidence and, to the extent that it may properly be considered upon a motion for summary judgment, the evidence has been construed in the light most favorable to Plaintiff.

[3] Citations to Plaintiff's deposition testimony utilize the transcript's pagination rather than the pagination set by the Court's CM/ECF system.



AO 72A
(Rev.8/82)

had downtime between live customers. (SC ¶ 37; Pl. Resp. SC ¶¶ 37-38; Pl. Dep. at 52, 78).

Beginning in 2007, Plaintiff worked principally at the Conyers local office. (SC ¶ 25; Pl. Resp. SC ¶ 25). Later, she was also assigned to work every other Wednesday at the South DeKalb local office. (SC ¶ 25; Pl. Resp. SC ¶ 25). In August 2013, Danyel Pringle became Plaintiff's supervisor. (SC ¶ 26; Pl. Resp. SC ¶ 26). In January 2014, Danny Johnson became the customer service manager for the Metro East region, and Ms. Pringle began reporting to him. (SC ¶¶ 27-28; Pl. Resp. SC ¶¶ 27-28).

Plaintiff's father passed away on February 9, 2014. (SC ¶ 29; Pl. Resp. SC ¶ 29). Around that time, Plaintiff's grandfather died, her mother-in-law died, she had a miscarriage, and her mother was diagnosed with Alzheimer's disease. (Pl. Resp. SC ¶ 29; Pl. Dep. at 72-73). After her father died, Plaintiff took time off from work to take care of her father's estate and to assist her mother. (SC ¶ 31; Pl. Resp. SC ¶ 31). Plaintiff requested and was approved for Family and Medical Leave Act ("FMLA") leave to assist her mother from February 10, 2014, through May 5, 2014. (SC ¶ 32; Pl. Resp. SC ¶ 32).



AO 72A
(Rev.8/82)

Before coming back to work from FMLA leave, Plaintiff called Ms. Pringle on April 17, 2014, and proposed that she be permitted to telecommute, so that she could handle issues related to her mother's health and her father's affairs in Michigan. (SC ¶¶ 33-34; Pl. Resp. SC ¶¶ 33-34). Ms. Pringle responded that teleworking was not done at their office, stating "they do that at McDonough." (Pl. Resp. SC ¶ 35; Pl. Dep. at 92-93). Plaintiff returned to work on May 6, 2014. (SC ¶ 43; Pl. Resp. SC ¶ 43).

On or around May 13, 2014, Plaintiff went to see a psychiatrist and was diagnosed with severe depression disorder and generalized anxiety disorder. (SC ¶ 44; Pl. Resp. SC ¶ 44). Plaintiff was approved for paid leave for her severe depression disorder and generalized anxiety disorder from May 16, 2014 through June 16, 2014. (SC ¶¶ 45, 49; Pl. Resp. SC ¶¶ 45, 49).

The first portion of Plaintiff's medical leave, the portion from May 16, 2014, until May 28, 2014, when her FMLA leave allotment was exhausted, was approved under the FMLA. (SC ¶ 50; Pl. Resp. SC ¶ 50). On May 28, 2014, Ms. Pringle sent Plaintiff a letter explaining how her absence would be coded and paid. (SC ¶ 119; Pl. Resp. SC ¶ 119). The letter explained that Plaintiff's FMLA leave expired on May 28, 2014, and that the management team had decided to grant Plaintiff the



AO 72A
(Rev.8/82)

remainder of her basic sick time and then grant her extended sick time through June 16, 2014, but that any additional absence would not be paid. (SC ¶¶ 51, 119; Pl. Resp. SC ¶¶ 51, 119). The letter also noted that the FMLA provides the benefits of job protection and benefit continuation and that Plaintiff's absences past May 28, 2014, would not be coded as FMLA leave. (P ¶ 43; Pl. Exh. 19 [Doc. 48-19 at 2]).

Plaintiff's psychiatrist evaluated her on June 12, 2014, and released her to return to work effective June 17, 2014, without restrictions but with continued monitoring by her doctor. (SC ¶ 52; Pl. Resp. SC ¶ 52; Pl. Dep. at 140 & Exh. 31 [Doc. 62-30 at 2]). Plaintiff returned to work on June 17, 2014. (SC ¶ 53; Pl. Resp. SC ¶ 53).

On July 25, 2014, Plaintiff received an oral reminder in connection with a safe being left open. (SC ¶ 56; Pl. Resp. SC ¶ 56). On July 28, 2014, Plaintiff filed a statement of concern entitled Unfair Disciplinary Action for Janaye Montgomery 07/25/14. (SC ¶ 57; Pl. Resp. SC ¶ 57; Pl. Dep. at 145 & Exh. 33 [Doc. 62-32 at 2]). In her statement, Plaintiff wrote, in relevant part,

> On 07/25/14 Danyel Pringle and Danny Johnson called me into a meeting to inform me that I was being placed on oral discipline for Duty to Act for not informing them that the safe was left open on 05/08. There is nothing in place that states what I am to do when the safe is left open. For example there are policies in place that clearly show a step by step process of what actions are to be taken in the event of a robbery, burglary,



AO 72A
(Rev.8/82)

> accidents etc. It has been 79 days since this occurrence, and I find it very troubling that I have not been coached about this situation before now.
>
> Duty to Act is a policy in place to notify management of an Established policy or procedure that has been violated. There is nothing in standards or the Metro-East business office expectations that clearly define what you should [do] in the event that the safe is left open.
>
> I encourage you to please come out to speak with myself as well as other employees to address additional concerns regarding repeated incidents of Harassment/Abuse of Power/Retaliation/Bullying/HIPPA [sic] Violations/Hostile Work Environment.

(Pl. Dep. Exh. 33 [Doc. 62-32 at 2-3]). On July 29, 2014, Wanda Robins, an Ethics Coordinator in Georgia Power's Workplace Ethics department, interviewed Plaintiff regarding her concerns. (SC ¶ 58; Pl. Resp. SC ¶ 58). During the interview, Plaintiff gave Ms. Robins a six-page statement outlining various problems she had with Ms. Pringle and Mr. Johnson's management. (SC ¶ 59; Pl. Resp. SC ¶ 59; Pl. Dep. Exh. 34 [Doc. 62-33]). In the statement, Plaintiff raised myriad issues in addition to the coaching about the safe: that Ms. Pringle refused to replace the office's broken coffee pot, became irritated when she found that Plaintiff left the premises during breaks to get coffee, and changed policy so that employees could no longer leave the premises during breaks; that Ms. Pringle did not act on Plaintiff's suggestion to better secure security ropes for the safety of customers' children and instead



AO 72A
(Rev.8/82)

responded that "customers need to watch their kids," which added stress to Plaintiff's work environment and signaled to Plaintiff a lack of concern; that Ms. Pringle did not want to use customer forms and instead required that customers orally state their addresses, despite Plaintiff having expressed concerns in an open forum that the decision was likely to take away the customers' sense of security; that Ms. Pringle had refused a co-worker's request to adjust her workspace to accommodate her height and was angry when the co-worker mentioned the issue to higher management in an informal conversation and was then accommodated; that work hours were changed, in that office only and without explanation, which resulted in the office having reduced time to balance the day's receipts after closing; that Ms. Pringle interrupted an informal conversation between Plaintiff and the regional manager to ask Plaintiff to "fix" a voided transaction that was already properly completed, which caused Plaintiff to feel disrespected; that in mid-December, Ms. Pringle criticized Plaintiff for not checking a drop box at 8:25 a.m., when standard operating procedure was that the box should be checked at 8:30 a.m., and for addressing her in a hostile manner; that Ms. Pringle called the following week at 8:35 a.m. to find out how many items were in the drop box, questioned why Plaintiff had not yet been out to check the drop box, and admitted that there were no customer issues that prompted her call, leading Plaintiff to feel that she



AO 72A
(Rev.8/82)

was being bullied; that in December Ms. Pringle had invaded Plaintiff's privacy by asking specific questions about her illness when she called in sick; that in April when Plaintiff called Ms. Pringle to discuss the possibility of extending her leave or teleworking and told her that she was "emotionally overwhelmed and needed additional time to resolve issues," Ms. Pringle sounded irritated and replied sarcastically, "we don't do that here, that department is in Mc[D]onough," and offered no alternatives; when Plaintiff contacted Ms. Pringle again on April 28 to request a meeting with Ms. Pringle, Mr. Johnson, and human resources representative Calandria Lee, Ms. Pringle said that she would contact the others to request a meeting and would call Plaintiff back, but Plaintiff heard nothing further; that when Plaintiff returned to work on May 5, she did not receive a call from her supervisor to welcome her back, which caused her to feel ignored; that on May 5, Ms. Pringle "finally" set up for May 8 the meeting Plaintiff had requested; that during the May 8 meeting, Plaintiff stated that she informed Mr. Johnson of Ms. Pringle's "lack of willingness to assist and refusal to look into other reasonable accommodations," stated that she felt that Ms. Pringle's lack of empathy was personal, and stated that she felt that the lack of empathy was proven during the meeting when Ms. Pringle remarked that she did not have additional time off when her father died; that although Plaintiff was given extended leave after she stated



AO 72A
(Rev.8/82)

at the meeting that she was herself ill and had been prescribed medication, the leave was given to her not because Ms. Pringle had found a solution but instead because Plaintiff had researched and presented the option; that upon Plaintiff's return to work on June 17, Ms. Pringle would have required Plaintiff to schedule her follow-up appointments around work had Mr. Johnson not overruled her; and that although Ms. Pringle was an experienced timekeeper, on July 3, Ms. Pringle entered Plaintiff's time incorrectly, was notified by Plaintiff, and was corrected by Mr. Johnson. (SC ¶ 60; Pl. Resp. SC ¶ 60; Pl. Dep. Exh. 34 [Doc. 62-33]). In conclusion, Plaintiff wrote, "This shows malice. This is a witch hunt to have me terminated and something must be done about these instances [of] discrimination/harassment/bullying/retaliation. *Note on page 8 it clearly shows that she was well aware of my difficulty in re-adjusting to the work environment. ADA." (Pl. Dep. Exh. 34 [Doc. 62-33] at 6). Ms. Robins did not share the six-page statement Plaintiff had given her with Mr. Johnson or Ms. Pringle, nor did she tell Mr. Johnson or Ms. Pringle that Plaintiff had complained about discrimination based on disability or a medical condition. (SC ¶¶ 61-62; Pl. Resp. SC ¶¶ 61-62; P ¶ 5; GP Resp. ¶ 5; SC Resp. ¶ 5).

A few days later, on August 1, 2014, Mr. Johnson, along with human resources representative Ms. Lee, met with Plaintiff to discuss certain behaviors Plaintiff had

displayed at work. (SC ¶ 63; Pl. Resp. SC ¶ 63). During the meeting, Mr. Johnson spoke to Plaintiff about certain of her behavioral issues, including finger-pointing, loud talking, and aggressive movements. (SC ¶ 65; Pl. Resp. SC ¶ 65).

On August 22, 2014, Plaintiff completed an employee engagement survey. (SC ¶ 66; Pl. Resp. SC ¶ 66). In the narrative portion of the survey, Plaintiff stated the following:

> Current Work Place Ethics Complaint against immediate supervisor Danyel Pringle for hostile work environment [sic]. Both Danny Johnson and Danyel Pringle have a do as I say leadership style []. Top 5 CSO Goals include value [sic] employees. Neither one of them seem to understand that your employees are the driving force of this company. They speak of a community environment however do everything to make sure that the business unit is divided. They do everything to criticize and look for fault and think of ways to increase work load rather than fostering positive relationships. The approach is divide and conquer. The approach does not at all resemble that of Southern Style and the company should be wary of this. Hopefully the WPE case will shed light on this. People have been fired and written up because clear expectations have not been set. Danny and Danyel seem eager to move to discipline when their own due diligence was not thorough so that a clear understanding was reached.
>
> Regardless of what is said nothing changes. There have been several complaints. Employee morale is very low. As with most companies[,] processes become mundane and practices are repeated from years of habit. Rather than assuming that my interpretation is the same as yours . . . Set Clear Expectations early on so we can make sure we're on the same page. Then if violations occur after that move to action. Don't have a meeting 8 months after starting the job to talk about your expectations. Complete failure by Danny Johnson and Danyel Pringle. I have never seen such



AO 72A
(Rev.8/82)

> horrible management in any company let alone Southern. Lastly, other than this format there is no way to communicate on how supervision is doing. Employees have reviews quarterly and employees should be allowed to review supervision. This would help alleviate concerns before they reach this point.
>
> I am aware that speaking up will cause retaliation in one form or another including digging for previous errors/ issues that are used to support discipline action. There should be a statute of limitation on when an issue is dead (if not addressed in a timely manner). It is imperative to understand that because of management (Danny Johnson, Danyel Pringle) failures it has caused mistrust that cannot be won over. This evokes frustration misinterpreted as behavioral problems against the persons[] bringing the accusation. I believe Mr. King may be somewhat aware but for the most part been left in the dark of this militarization approach, which has had a very negative impact on the Metro East work force. The need to be first in all things will leave attention to detail lacking. Lastly, Metro East has a clientele base of almost 500,000 while Columbus has 139,000. The strategies that worked there cannot be applied wholly to an organization almost quadruple that size.
>
> Lastly, adhere to the CSO Vision. Behind safety, Employee Value is number two. Customer Value is number three. If we adhere to number two number three will be achieved without pressure or militarization. We should be harnessing the knowledge of 100 + years of experience and welcoming the "questioning attitude" that Anthony Wilson speaks about, and giving face to the "The Human Performance" adopted by Distribution in the Citizen July 11 2014.

(SC ¶ 66; Pl. Resp. SC ¶ 66; Pl. Dep. Exh. 37 [Doc. 62-36]). Neither Mr. Johnson nor Ms. Pringle ever saw or heard about the contents of Plaintiff's employee engagement survey. (SC ¶ 67; Pl. Resp. SC ¶ 67).



AO 72A
(Rev.8/82)

On September 3, 2014, an incident occurred where Plaintiff asked a security officer to get a customer to leave the building. (SC ¶ 68; Pl. Resp. SC ¶ 68; Pl. Dep. at 171, 174). The customer was not Plaintiff's customer, but rather was a person waiting to be helped by another customer service representative. (SC ¶ 69; Pl. Resp. SC ¶ 69). When the incident occurred, Plaintiff was closed for the day and her window blind was down. (SC ¶ 70; Pl. Resp. SC ¶ 70). Plaintiff overheard the customer talking very harshly to her coworker, Ulysses Monday, and observed the customer pointing in his face and saying that the length of her wait didn't make sense and that he was "sorry." (SC ¶ 71; Pl. Resp. SC ¶ 71). The customer then pointed at Plaintiff and said, "you sorry, too. I've been in line, I've been watching you, you lazy. You lazy and you sorry. As a matter of fact, all ya'll lazy and sorry." (SC ¶ 72; Pl. Resp. SC ¶ 72; Pl. Dep. at 174). At that point, Plaintiff said to the customer, "no ma'am, I won't allow you to talk to me like that, you can leave." (SC ¶ 73; Pl. Resp. SC ¶ 73). Plaintiff did not attempt to calm the customer down but instead looked in the break room for the off-duty police officer who was working as a security officer and told him to get the customer "out of here." (SC ¶¶ 74-75; Pl. Resp. SC ¶¶ 74-75; Pl. Dep. at 174). Plaintiff accompanied the security officer to the customer, who was in the process of making her payment with Mr. Monday, and



AO 72A
(Rev.8/82)

the officer directed the customer to leave. (SC ¶ 76; Pl. Resp. SC ¶ 76). The customer replied that she had been standing in line for an hour and should be able to make her payment. (SC ¶ 77; Pl. Resp. SC ¶ 77; Pl. Dep. at 175). The security officer told the customer she could not pay her bill and escorted her out. (SC ¶ 78; Pl. Resp. SC ¶ 78).

Ms. Pringle learned of the incident between Plaintiff and the customer that same day, when she received a text from one of Plaintiff's coworkers and when the customer called Georgia Power to complain about Plaintiff. (SC ¶ 81; Pl. Resp. SC ¶ 81). Ms. Pringle then conducted an investigation of the incident. (SC ¶ 82; Pl. Resp. SC ¶ 82). As part of her investigation, Ms. Pringle listened to a recording of the customer's complaint, talked with the customer, watched the security video of the incident, interviewed Plaintiff, took a statement from the security officer, and interviewed the other employees who were present at the time of the customer incident. (SC ¶¶ 83, 85; Pl. Resp. SC ¶¶ 83, 85). After the incident, Plaintiff stated that she would have handled the situation the same way again. (Pl. Resp. SC ¶ 84).

Ms. Pringle reported the results of her investigation of the September 3 incident to Mr. Johnson. (SC ¶ 86; Pl. Resp. SC ¶ 86). Mr. Johnson reviewed the result of Ms. Pringle's interviews, the statement from the off-duty police officer, and the surveillance video capturing the incident. (SC ¶ 87; Pl. Resp. SC ¶ 87). Based on his



AO 72A
(Rev.8/82)

review, Mr. Johnson found that Plaintiff had inappropriately engaged with another customer service representative's customer, directed the customer to leave without first attempting to calm her down, directed the officer to tell the customer to leave rather than allowing the officer to address the situation, failed to acknowledge that her behavior was inappropriate during the company's investigation into the incident, and stated that she would have handled the situation the same way again, all of which Mr. Johnson found to be in violation of the company's principles and code of ethics, and Mr. Johnson therefore decided to terminate Plaintiff's employment. (SC ¶¶ 84, 87-92; Pl. Resp. SC ¶¶ 84, 87-92).

Plaintiff was informed of her termination on September 23, 2014. (SC ¶ 99; Pl. Resp. SC ¶ 99). On September 24, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), naming Georgia Power Company as her employer. (SC ¶ 107; Pl. Resp. SC ¶ 107; Pl. Dep. at 60-61 & Exh. 12 [Doc. 62-11 at 1]). In the charge, Plaintiff alleged discrimination based on disability and retaliation. (Pl. Dep. Exh. 12 [Doc. 62-11 at 1]). The particulars of her charge were as follows:

> I was hired by the above named employer on February 20, 1999. I informed my Supervisor of my disability on May 1, 2014. I returned to



AO 72A
(Rev.8/82)

> work on June 17, 2014. On July 25, 2014, I was written up for an incident that occurred on May 8, 2014. I was terminated on September 23, 2014.
>
> The reason given for terminating my employment was due to "violation of Georgia Power Southern Style, unquestionable trust, total commitment, superior performance and code of ethics."
>
> I believe that I was discriminated against due to my disability, in violation of Title I of the Americans with Disabilities Act of 1990, as amended. I also believe that I was retaliated against due to my disability, in violation of Title I of the Americans with Disabilities Act of 1990, as amended.

(Pl. Dep. Exh. 12 [Doc. 62-11 at 1]).

On August 24, 2015, Plaintiff filed the instant lawsuit against Georgia Power and Southern Company under the ADA, alleging disability discrimination, retaliation, and failure to accommodate. (Compl. [Doc. 1]). While the grounds for her claims are not entirely clear, she appears to contend that her termination resulted from disability discrimination and was effected in retaliation for her Workplace Ethics complaint, (Count I), and that Defendants failed to provide her a reasonable accommodation by denying her requests for additional leave time and permission to telecommute, (Count II). (*Id.* ¶¶ 9, 21-33).

After close of extended discovery, on May 19, 2016, Defendants and Plaintiff filed the motions for summary judgment that are presently pending before the Court, [Doc. 43 (Georgia Power); Doc. 44 (Southern Company); Doc. 48 (Plaintiff)]. Plaintiff

filed responses to Georgia Power's and Southern Company's motions on June 9, 2016, [Docs. 64-69], and made motions to amend her response briefs the following day, [Docs. 71, 73]. Defendants then filed a response to Plaintiff's motion for summary judgment on June 13, 2016, [Doc. 70]. On June 16, 2016, Plaintiff filed a document construed by the Clerk as a reply brief supporting her motion for summary judgment, [Doc. 75], and on June 27, 2016, Defendants filed replies in support of their motions for summary judgment, [Docs. 76, 78 (Georgia Power); Docs. 77, 79 (Southern Company)]. With briefing complete, the Court now considers the motions.

## ***III. Motions for Leave to Amend Response Briefs***

Plaintiff moves for leave to amend both of her response briefs, representing that the new briefs present the same arguments and legal authority as the original briefs but account for "significant factual and procedural initial events" that she inadvertently omitted from the original briefs. [Docs. 71, 73]. Defendants did not file a response in opposition to the motions, (*see* Dkt.), and instead filed reply briefs that addressed both the initial brief and the proposed amended brief, [Doc. 76 at 1 n.1; Doc. 77 at 1 n.1].

Plaintiff's proposed amended briefs do not comply with the Local Rules of this Court or the Court's scheduling order, as they exceed the page limitation set forth in the Local Rules, *see* LR 7.1D, NDGa (limiting response briefs to twenty-five pages), and



AO 72A
(Rev.8/82)

cite directly to evidence rather than to statements of material fact, in contravention of the scheduling order, [*see* Doc. 22 at 8]. Nevertheless, because Plaintiff proffered the proposed amended response briefs in conjunction with her motions, thereby allowing Defendants an opportunity to respond to the amended briefs, and because Defendants do not oppose the motion,[4] the Court will exercise its discretion to allow the amendments. Accordingly, Plaintiff's motions for leave to file amended response briefs are hereby **GRANTED**, [Docs. 71, 73], and the Court **SHALL** construe the proposed briefs as the response brief filed in opposition to Southern Company's motion for summary judgment, [Doc. 72, replacing Doc. 64-1], and the response brief filed in opposition to Georgia Power's motion for summary judgment, [Doc. 74, replacing Doc. 68-2].

## ***IV. Motions for Summary Judgment***

Plaintiff and both Defendants all seek summary judgment on all of Plaintiff's claims. [Docs. 43, 44, 48]. After reviewing the ADA legal framework, the Court will address the arguments in their logical order.

---

[4] "Failure to file a response shall indicate that there is no opposition to the motion." LR 7.1B, NDGa.



AO 72A
(Rev.8/82)

***A. ADA Legal Framework***

The ADA prohibits covered entities from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[T]here are two distinct categories of disability discrimination claims under the ADA: (1) failure to accommodate and (2) disparate treatment." *E.E.O.C. v. Eckerd Corp.*, Civ. Action No. 1:10-cv-2816-JEC, 2012 WL 2726766, at *4 (N.D. Ga. July 9, 2012) (Carnes, J.). Retaliation against a person claiming a right under the ADA or opposing a practice made unlawful by the ADA is also prohibited. 42 U.S.C. § 12203.

"Plaintiffs proceeding under the ADA must comply with the same procedural requirements articulated in Title VII [of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. 2000e, *et seq.*], including the duty to exhaust administrative remedies." *E.E.O.C. v. Summer Classics, Inc.*, 471 Fed. Appx. 868, 869 (11th Cir. June 12, 2012) (citing 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5)); *see also Duble v. FedEx Ground Package Sys., Inc.*, 572 Fed. Appx. 889, 892-93 (11th Cir. July 24, 2014) (applying Title VII exhaustion requirement to ADA claim). Accordingly, before a plaintiff may file a claim under the



AO 72A
(Rev.8/82)

ADA, she must first file a charge of discrimination with the EEOC. *Summer Classics, Inc.*, 471 Fed. Appx. at 869-70 (citing 42 U.S.C. § 2000e-5(e)(1) and analogizing 29 C.F.R. § 1626.7(a)).

ADA claims also are analyzed using the same burden-shifting analysis applicable to claims asserted under Title VII. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007). To establish a claim, an individual may proffer direct or circumstantial evidence of discrimination. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). When a party relies on circumstantial evidence to prove his or her case of discrimination, as Plaintiff does in the instant case, courts employ the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

Under the *McDonnell Douglas* framework, a plaintiff first must establish a *prima facie* case of discrimination. *See, e.g., Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*,



AO 72A
(Rev.8/82)

446 F.3d 1160, 1162 (11th Cir. 2006). If a plaintiff establishes a *prima facie* case, she has created an inference of discrimination, and the defendant has the burden of producing a legitimate, non-discriminatory reason for its challenged action. *Id.* If the defendant meets this light burden, then the inference of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id.* (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)). To demonstrate pretext, the plaintiff must provide evidence that "reveal(s) 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' " *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253).



AO 72A
(Rev.8/82)

***B. Failure to Accommodate***

In her motion for summary judgment, Plaintiff refers to the portion of her deposition in which she discussed her April 2014 request for permission to telecommute, [Doc. 48 at 14 n.15 (citing Pl. Dep. at 77-79)]; an e-mail exchange among Georgia Power management on March 21, 2014, suggesting that a leave of absence might be an option for Plaintiff, [Doc. 48 at 14 n.16 [citing Doc. 48-16 at 2-3]]; an e-mail Ms. Pringle wrote on May 13, 2014, stating that Plaintiff had notified her that she had seen a psychiatrist that day and would provide a medical opinion regarding her fitness for duty, [Doc. 48 at 14 n.17 [citing Doc. 48-17 at 2]]; a certification from Plaintiff's physician, dated May 15, 2014, that Plaintiff was unable to work through at least June 16, 2014, when she would be reevaluated, [Doc. 48 at 14 n.18 [citing Doc. 48-18 at 2]]; the letter from Ms. Pringle to Plaintiff dated May 28, 2014, stating how Plaintiff's absence would be coded and paid and when her FMLA protections would end, [Doc. 48 at 14 n.19 [citing Doc. 48-19 at 2]]; an e-mail dated October 1, 2014, from Plaintiff to Cinnamon Davis of Georgia Power, in which Plaintiff stated that she had been intimidated into returning to work by the letter stating that her FMLA protections were ending, [Doc. 48 at 14 n.20 [citing Doc. 48-20 at 2-4]]; the opinion Plaintiff's physician issued on June 12, 2014, stating that she could return to work full



AO 72A
(Rev.8/82)

duty without restrictions on June 17, 2014, and would continue to be monitored, [Doc. 48 at 14 n.21 [citing Doc. 48-19 at 2]]; and the portion of Plaintiff's deposition in which she stated that she believed Defendants' handling of her requests for time off was not in compliance with the ADA, [Doc. 48 at 15 nn.22, 23 (citing Pl. Dep. at 225-38)].[5] Thus, while it is not entirely clear, Plaintiff appears to claim that Defendants violated the ADA by failing to accommodate her request to telecommute or her desire to take additional time away from work while having her position held open for her. [*See* Doc. 48 at 14-15; *see also* Doc. 1 (Compl.) ¶¶ 9, 27-32].

Both defendants argue that they are entitled to summary judgment on Plaintiff's failure-to-accommodate claims because Plaintiff never alleged failure to accommodate in her EEOC charge and thus failed to exhaust her administrative remedies on the claims prior to filing suit. [Doc. 43-2 at 4, 18-20 (citing GP ¶ 86); Doc. 44-2 at 10 (citing SC ¶ 107)]. Plaintiff admits that her charge of discrimination did not proffer any facts concerning an alleged failure to accommodate her in violation of the ADA,

---

[5] Plaintiff's brief does not comply with the Court's order to cite statements of material fact, [*see* Doc. 22 at 8, ¶ 2], and although she purports to cite directly to evidence, her citations do not correspond directly to any designations appearing in the record, [*see e.g.*, Doc. 48 at 14 nn.15-21]. For the District Judge's convenience, the undersigned has, where practicable, provided citations to evidence or statements of material fact that appear to match Plaintiff's descriptions and the exhibit list attached to her motion for summary judgment, [*see* Doc. 48 at 21-23].



AO 72A
(Rev.8/82)

(GP ¶¶ 85-86; Pl. Resp. GP ¶¶ 85-86; SC ¶¶ 106-07; Pl. Resp. SC ¶¶ 106-07), and she does not set forth any argument to suggest that she somehow nevertheless exhausted her administrative remedies with regard to her reasonable-accommodations claims or that she should be excused from doing so, [*see* Docs. 72, 74].

Plaintiff's failure to respond to Defendants' arguments concerning the exhaustion of her failure-to-accommodate claims warrants an award of summary judgment in Defendants' favor on those claims. A party has an obligation to respond to an argument raised in a motion for summary judgement. *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1139 (N.D. Ga. 2007) (Forrester, J.) (granting summary judgment as to plaintiff's state-law claims because plaintiff did not respond to defendant's summary judgment motion on those claims); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) (Duffey, J.) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."); *Welch v. Delta Air Lines*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (Hull, J.) ("Plaintiff's failure to respond to [d]efendant's argument alone entitles [d]efendant to summary judgment on these claims.").



AO 72A
(Rev.8/82)

Thus, Plaintiff has abandoned her ADA failure-to-accommodate claims. *See Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001) (holding that issues not briefed are deemed abandoned); *Carter v. ALK Holdings, Inc.*, 510 F. Supp. 2d 1299, 1302 n.3 (N.D. Ga. 2007) ("Because Plaintiff failed to respond to Defendants' argument regarding this claim, the Court deems it abandoned."), *rev'd, in part, on other grounds* 605 F.3d 1319 (Fed. Cir. 2010); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp. 2d 1228, 1236 (M.D. Ala. 2000) (explaining that "[i]t is not for the court to manufacture arguments on Plaintiff's behalf"); *Bute v. Schuller Int'l, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (Hunt, J.) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned.").

Moreover, the Court finds Defendants' argument persuasive. Title VII, and thus, the ADA, *see* 42 U.S.C. § 12117(a), prohibits a plaintiff from alleging new acts of discrimination in the judicial complaint that were not raised in the EEOC charge. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004). The purpose of the exhaustion requirement " 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.' "



AO 72A
(Rev.8/82)

*Gregory*, 355 F.3d at 1279 (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983) (alteration in *Gregory*)). "Courts are . . . 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII],' " however. *Gregory*, *id.* (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460-61 (5th Cir. 1970)[6] (alteration in *Gregory*)). Thus, the EEOC charge is not to be " 'strictly interpreted,' " *Gregory*, *id.* (quoting *Sanchez*, 431 F.2d at 465), and a plaintiff may bring claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint, *Gregory*, *id.* (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)). Accordingly, "the proper inquiry" is whether the "complaint was like or related to, or grew out of, the allegations contained in her EEOC charge." *Gregory*, 355 F.3d at 1280; *see also Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (holding that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.") (internal quotation and citation omitted), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.



AO 72A
(Rev.8/82)

An employer's failure to accommodate is one of several separate acts of discrimination giving rise to a separate cause of action under a separate theory of liability under the ADA. *Nelson v. PMTD Rests., LLC*, No. 3:12-cv-369-MEF, 2013 WL 4045086, at *8 (M.D. Ala. Aug. 8, 2013) (citing 42 U.S.C. § 12112(b)(5)(A); *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998) (setting forth the distinct elements and burdens of proof that apply to ADA failure-to-accommodate claims)). "To state a prima facie case of disability discrimination, a plaintiff must show (1) that she has a disability; (2) that, with or without reasonable accommodations, she can perform the essential functions of the position she holds; and (3) that she was discriminated against because of her disability." *Terrell, id*. Here, Plaintiff's charge is limited to allegations of discrimination and retaliation related to the July 25, 2014, counseling and her termination; she does not mention anywhere that either defendant failed to provide her a reasonable accommodation so that she could perform the essential functions of her job. (Pl. Dep. Exh. 12 [Doc. 62-11 at 1]). For these reasons, the undersigned concludes that Plaintiff did indeed fail to raise her failure-to-accommodate claims before the EEOC and thus did not exhaust her administrate remedies as to those claims prior to filing suit.



AO 72A
(Rev.8/82)

Accordingly, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's ADA failure-to-accommodate claims and that Plaintiff's motion for summary judgment on those claims be **DENIED**.[7]

---

[7] Even if Plaintiff had properly exhausted her administrative remedies as to her failure-to-accommodate claims, Defendants would nevertheless be entitled to summary judgment on those claims. Plaintiff testified that she requested approval to telecommute not as an accommodation for her own disability but rather so that she could handle issues related to her mother's health and her father's affairs in Michigan, (GP ¶ 13; Pl. Resp. GP ¶ 13; SC ¶ 34; Pl. Resp. SC ¶ 34). The ADA does not require employers to make a "reasonable accommodation" for the disability of a relative or associate. *See Sanford v. Slade's Country Stores, LLC*, 709 F. Supp. 2d 1232, 1240 (M.D. Ala. 2010) (holding that the "associational provision of the ADA does not require employers to make any 'reasonable accommodations' for the disabilities of relatives or associates of a nondisabled employee"); *Rocky v. Columbia Lawnwood Regional Med. Ctr*., 54 F. Supp. 2d 1159, 1165 (S.D. Fla. 1999) (same); *cf. Hilburn v. Murata Elecs. N.A., Inc*., 17 F. Supp. 2d 1377, 1383-84 (N.D. Ga. 1998) (Evans, J.) (citing legislative history stating that if an employee "violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [employee's disabled] spouse"), *aff'd*, 181 F.3d 1220 (11th Cir. 1999). To the extent that her reasonable-accommodation claims are based on allegations that Defendants wrongfully denied her extended leave, (Compl. ¶ 29), such claims are also unavailing because it is undisputed that Plaintiff's physician released her to return to work effective June 17, 2014, without restrictions, (SC ¶ 52; Pl. Resp. SC ¶ 52; Pl. Dep. at 140 & Exh. 31 [Doc. 62-30 at 2]), and Plaintiff admits that she never informed her supervisor that she did not believe she was fit to return to work or requested any further leave, (SC ¶¶ 54-55; Pl. Resp. SC ¶¶ 54-55; Pl. Dep. at 141-42); she admits that her case did not meet Georgia Power's disability case management criteria because Plaintiff's leave of absence was only for thirty days, after which time her doctor released her to work without restrictions, (SC ¶ 113; Pl. Resp. SC ¶ 113); and she admits that she does not believe that Mr. Johnson or Ms. Pringle thought she was disabled, (SC ¶¶ 121-22; Pl. Resp. SC ¶¶ 121-22). "[T]he initial burden of requesting an accommodation is on the employee," and "[o]nly after



AO 72A
(Rev.8/82)

### *C. Wrongful Termination*

Plaintiff also alleges that her termination was the result of disability discrimination and was effected in retaliation for her Workplace Ethics complaint. (Compl. ¶¶ 21-26). Defendants argue that the claims are subject to summary judgment because Plaintiff cannot establish a *prima facie* case of discrimination or retaliation; Mr. Johnson terminated Plaintiff's employment for a legitimate, non-discriminatory reason; and Plaintiff cannot show that the reason was a pretext for discrimination. [Doc. 43-2 at 8-18; Doc. 44-2 at 8-12].

For the purposes of this R&R, the Court presumes, without deciding, that Plaintiff can establish *prima facie* cases of discrimination and retaliation.[8] The Court,

---

the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1364 (11th Cir. 1999); *see also Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016) (The employer's statutory "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.") (punctuation omitted); *cf. Scott v. Shoe Show, Inc.*, 38 F. Supp. 3d 1343, 1361 (N.D. Ga. 2014) ("Simply put, the ADA does not require clairvoyance, and asking the employer to guess is asking too much of the employer, and of the ADA.") (punctuation omitted).

[8] The Court does not find Defendants' challenges to the *prima facie* cases to be particularly strong. To state a *prima facie* case for a disparate-treatment claim under the ADA, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated



AO 72A (Rev.8/82)

similarly situated employees outside her class more favorably or otherwise indicated that discriminatory animus was the cause of the adverse employment action; and (4) she was qualified to do the job. *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). To establish a *prima facie* case for a retaliation claim under the ADA, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal link between the two. *Frazier-White*, 818 F.3d at 1258; *Lucas v. W.W. Granger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001); *see also Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008) (recognizing that the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), broadened the type of employer conduct considered actionable in a retaliation claim, from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment- or workplace-related).

It is true, as Defendants point out, that it is questionable, at best, whether Plaintiff's mental impairments "substantially" limit a major life activity such that she may qualify as "disabled" within the context of the ADA. [*See* Doc. 43-2 at 9-10 (referencing 42 U.S.C. § 12102(1))]. As Plaintiff aptly notes, however, the Eleventh Circuit has recognized that in enacting amendments to the ADA, Congress indicated that "one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.' " *Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12101 note). Moreover, because Plaintiff does have a documented diagnosis of depression disorder and generalized anxiety disorder sufficiently severe to prevent her from working for a month, (SC ¶¶ 44-45, 49; Pl. Resp. SC ¶¶ 44-45, 49); under the ADA, "major life activities" include "concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(2); Defendants have alleged that Plaintiff's employment was terminated because of ill-advised decisions and inappropriate conduct, (SC ¶¶ 84, 87-92); and Plaintiff has testified that she remains incapable of working today, (Pl. Dep. at 169), the Court questions whether summary judgment should issue on these grounds.

The challenges to Plaintiff's *prima facie* case of retaliation are similarly weak. Defendants argue that Plaintiff's Workplace Ethics complaint did not constitute



AO 72A
(Rev.8/82)

however, finds that Defendants have set forth a legitimate, nondiscriminatory reason for the termination of Plaintiff's employment and that she has failed to proffer evidence sufficient to allow a reasonable fact finder to determine that the reason was a pretext for discrimination or retaliation. Consequently, Defendants' motions for summary judgment are due to be granted on these claims as well.

To succeed on summary judgment after the plaintiff establishes a *prima facie* case, the defendant must proffer a legitimate non-discriminatory reason for the

---

protected conduct, but they do not acknowledge that the six-page statement Plaintiff provided to the investigator made reference to the ADA. [*See* Doc. 43-2 at 14-15; Doc. 62-33 at 6]. Likewise, while Defendants proffer an unpublished case holding that a two-month gap between protected conduct and an adverse action is not alone close enough in time to establish an inference of causation, [*see* Doc. 43-2 at 16 (citing *Williams v. Waste Management, Inc.*, 411 Fed. Appx. 226, 229 (11th Cir. Jan. 25, 2011))], they do not acknowledge or attempt to distinguish other cases in this circuit in which courts reached the opposite conclusion, *see, e.g.*, *Robinson v. La Farge N. Am., Inc.*, 240 Fed. Appx. 824, 829 (11th Cir. June 19, 2007); *Embry v. Callahan Eye Found. Hosp.*, 147 Fed. Appx. 819, 831 (11th Cir. Aug. 23, 2005); *Batts v. Silver Line Bldg. Prods. Corp.*, Civ. Action File No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at *13 & n.10 (N.D. Ga. Feb. 22, 2010), *adopted at* 2010 WL 966861 (N.D. Ga. Mar. 12, 2010) (Duffey, J.); *Orquiola*, 510 F. Supp. 2d at 1155, nor do they acknowledge that the time that passed between Plaintiff's interview with the investigator and her termination was *less* than two months, (*see* GP ¶¶ 36, 37, 78; Pl. Resp. GP ¶¶ 36, 37, 78). The Court is also reluctant to rely on Defendants' suggestion that Mr. Johnson's lack of knowledge of Plaintiff's protected conduct interrupted causation, as the statement of material fact supporting the assertion rests entirely on Mr. Johnson's own self-serving testimony. [*See* Doc. 43-2 at 16 (citing GP ¶ 82)].



AO 72A
(Rev.8/82)

challenged actions. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). "A legitimate, non-discriminatory reason is one that might motivate a reasonable employer." *Loberger v. Del-Jen, Inc.*, 616 Fed. Appx. 922, 926 (11th Cir. June 25, 2015) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

Once the defendant proffers a legitimate non-discriminatory reason for the challenged actions, the plaintiff may yet survive summary judgment by providing evidence sufficient to allow a reasonable fact finder to determine that the employer's articulated, nondiscriminatory reasons are pretext for unlawful discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804-07; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (explaining that the "plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence") (internal citations omitted); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997); *see also Brooks*, 446 F.3d at 1163 (explaining that to avoid summary judgment once the defendant proffers a legitimate nondiscriminatory reason for the adverse action, the plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination,' ") (quoting *Clark v. Coats & Clark, Inc.*,



AO 72A (Rev.8/82)

990 F.2d 1217, 1228 (11th Cir. 1993)). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. Put another way, the "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002).

Defendants argue that Plaintiff was terminated because Mr. Johnson thought that Plaintiff had inappropriately engaged with a customer and refused to acknowledge that the behavior was inappropriate. [Doc. 43-2 at 12, 17-18; Doc. 44-2 at 8-9, 11]; (GP ¶ 71; SC ¶¶ 87-93). The Court finds that this a legitimate, nondiscriminatory reason that might motivate a reasonable employer.

In her response briefs, Plaintiff contends that Mr. Johnson's and Ms. Pringle's "evolving reasons" for her termination and their eventual explanation that she was fired for engaging in a "customer altercation" is "merely a ruse" to hide their true intent to fire her in retaliation for filing the Workplace Ethics complaint and completing the employee engagement survey. [Doc. 72 at 24; Doc. 74 at 23]. She first points out that Ms. Pringle had investigated the incident but had not witnessed it herself and that the investigation had taken place while Plaintiff's Workplace Ethics complaint against



AO 72A
(Rev.8/82)

Ms. Pringle was pending. [Doc. 72 at 17-18; Doc. 74 at 16]. She argues that any information Ms. Pringle provided about the incident should be considered unreliable and deemed inadmissible and never should have been considered by Georgia Power. [Doc. 72 at 18-19; Doc. 74 at 16-17]. Second, Plaintiff asserts that many employees had "severe grievances" regarding the office culture under Ms. Pringle and Mr. Johnson's management. [Doc. 72 at 19; Doc. 74 at 17-18]. Third, Plaintiff avers that the cause given for her termination was initially stated as "violation of Southern Style" but was later changed to "Engaging in Altercation with Customer." [Doc. 72 at 19; Doc. 74 at 18]. Fourth, Plaintiff contends that the reasons given for her termination are "baseless and without merit" because there was no written policy regarding an irate customer; "standard operating procedure" permits asking an irate customer to leave the premises; up to and including the year 2014, police, Plaintiff, and other employees had asked irate customers to leave the premises; Plaintiff did not initiate engagement with the customer and asked her to leave only after the customer pointed at her and called her "sorry" and "lazy"; Plaintiff requested the assistance of a security officer only after the customer refused to leave; Plaintiff did not brag about her conduct but rather stated to Ms. Pringle that the manner in which she handled the incident was no different from how she typically handled such matters; the customer's



AO 72A
(Rev.8/82)

conduct amounted to unlawful disorderly conduct; Mr. Johnson did not talk to Plaintiff about the incident and instead simply agreed with Ms. Pringle's perception of the events; Plaintiff's termination occurred in close proximity to her Workplace Ethics complaint and her completion of the employee engagement survey; her termination notice was signed by both Ms. Pringle and Mr. Johnson; and Ms. Pringle and Mr. Johnson became "aware of Plaintiff's medical condition and discontentment in how her disability was handled" in a meeting taking place on May 9, 2014. [Doc. 72 at 19-24; Doc. 74 at 18-23].

The undersigned finds these assertions insufficient to establish pretext. First, the admissibility or reliability of Ms. Pringle's statements regarding Plaintiff's conduct is not at issue here because Plaintiff admitted to the conduct giving rise to Mr. Johnson's decision. (SC ¶¶ 68-92; Pl. Resp. SC ¶¶ 68-92). To wit, Plaintiff admits that on September 3, 2014, when she was closed for the day and her window blind was down, she overheard the customer of another representative talking very harshly to the representative, pointing in his face, saying that the length of her wait did not make sense, and saying that he was "sorry"; when the customer then pointed at Plaintiff and said, "You sorry, too. I've been in line, I've been watching you, you lazy. You lazy and you sorry. As a matter of fact, all ya'll lazy and sorry," Plaintiff told the customer



AO 72A
(Rev.8/82)

she could not speak to her like that and needed to leave; Plaintiff then looked for the security officer in the break room and told him to get the customer "out of here"; Plaintiff did not attempt to calm the customer down before asking her to leave and instructing the officer to get her out of the building; Plaintiff accompanied the police officer to the customer, who was in the process of making her payment with another representative, and the officer directed the customer to leave without allowing her to make her payment. (SC ¶¶ 68-78; Pl. Resp. SC ¶¶ 68-78). Additionally, Plaintiff admits that the customer did not use any profanity and that Plaintiff did not feel physically threatened by the customer, thereby undermining her representations in her response briefs that the customer's conduct was so outrageous as to amount to unlawful disorderly conduct. (SC ¶¶ 79-80; Pl. Resp. SC ¶¶ 79-80). Plaintiff also has not shown Ms. Pringle's report to be unreliable: Plaintiff admits that Ms. Pringle learned of the incident on September 3, 2014, when one of Plaintiff's co-workers texted her and when the customer called Georgia Power to complain about Plaintiff; that Ms. Pringle then conducted an investigation of the incident; that Ms. Pringle's investigation included listening to a recording of the customer's complaint, talking with the customer, watching the security video of the incident, interviewing Plaintiff, taking a statement from the security officer, and interviewing other employees who had been present; that



AO 72A
(Rev.8/82)

Plaintiff stated after the incident that she would have handled the situation the same way again; and that the security officer, when asked to complete a statement, reported that after the customer asked if she could pay her bill, he asked Plaintiff whether the customer needed to leave, and Plaintiff said she did. (SC ¶¶ 81-85; Pl. Resp. SC ¶¶ 81-85).

Plaintiff also has not shown that Mr. Johnson's decision-making process suggests that the customer incident was not the real reason for her termination. Plaintiff admits that after Ms. Pringle reported the results of her investigation to Mr. Johnson, Mr. Johnson reviewed the result of Ms. Pringle's interviews, the security officer's statement, and the surveillance video capturing the incident; that based on his review, Mr. Johnson found that under the circumstances, Plaintiff should have tried to calm the customer down before asking her to leave, she should have allowed the officer to address the situation rather than directing him to have the customer leave, and her statement that she would handle the incident the same way again demonstrated an unwillingness to acknowledge or change her behavior; and that it was on that basis that Mr. Johnson decided to terminate Plaintiff's employment. (SC ¶¶ 86-92; Pl. Resp. SC ¶¶ 86-92). "[A]n employer does not unlawfully discriminate against an employee 'if the employer fired an employee because it honestly believed that the

employee had violated a company policy, even it if was mistaken in such belief.' " *Robinson v. Colquitt EMC*, 651 Fed. Appx. 891, 894-95 (11th Cir. June 2, 2016) (quoting *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987)). Additionally, Plaintiff does not show evidence that the explanation that Plaintiff was terminated for "engaging in an altercation with a customer" is materially different from the explanation that Plaintiff was terminated for engaging in a "violation of Southern Style"; rather, it appears that the two phrases are simply different ways of describing a customer interaction that did not, in Mr. Johnson's opinion, conform to Georgia Power's customer-service standards. [*See* Doc. 72 at 19; Doc. 74 at 18].

The Court is also unpersuaded by Plaintiff's allegations that she can show pretext because there was no written policy regarding irate customers; it was "standard operating procedure" to remove angry customers from Georgia Power premises without first attempting to calm the situation; and she acted reasonably under the circumstances. An employer's termination decision need not rest upon the violation of a written policy. *Dent v. Ga. Power Co.*, 522 Fed. Appx. 560, 563 (11th Cir. June 17, 2013) ("We have observed that the fact that an employer's decision was subjective, or that it was based on an unwritten or informal policy subject to differing interpretations, without more,



AO 72A
(Rev.8/82)

does not show that it was pretextual.") (citing *Conner v. Ft. Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir. 1985)).

Plaintiff also has made no showing that her conduct conformed to "standard operating procedure." It is true that "where an employer's proffered reason for termination is the violation of a workplace rule," a plaintiff may seek to prove pretext by proffer of evidence that she "did not violate the cited work rule," or, "if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Turner v. Inzer*, 521 Fed. Appx. 762, 765 (11th Cir. June 4, 2013) (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)). Plaintiff, however, does not proffer evidence that she did not violate Georgia Power's customer-interaction policies; rather, she suggests, without citing supportive non-hearsay evidence, that she handled the interaction properly according to Georgia Power custom. (*See* P ¶ 64 (citing Pl. Dep. at 179-80)). Moreover, the fact that Plaintiff or anyone other than her supervisors might not have viewed her conduct as inappropriate "does not prove pretext or establish a jury question as to pretext." *See Dent*, 522 Fed. Appx. at 564 (citing *Conner*, 761 F.2d at 1501); *see also Cusick v. Yellowbook, Inc.*, 607 Fed. Appx. 953, 955 (11th Cir. Apr. 20, 2015) ("The inquiry into pretext is concerned with the

employer's beliefs, not the employee's perceptions of his performance."); *Beckles v. Fed. Express Corp.*, 489 Fed. Appx. 380, 384 (11th Cir. Sept. 11, 2012) ("We do not sit as a super-personnel department, and we do not review the wisdom of an employer's business decisions, no matter how mistaken, as long as the action was not for a prohibited discriminatory reason.") (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010); *Alvarez*, 610 F.3d at 1266 ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . . ."). Additionally, there is no evidence that Mr. Johnson knew of other Georgia Power employees outside Plaintiff's class who engaged in similar conduct. In fact, it is undisputed that during the time Mr. Johnson had been responsible for the region in which Plaintiff worked, he had received no reports of any customer service representative other than Plaintiff directing a police officer to remove a disruptive customer from the premises, (SC ¶ 93; Pl. Resp. SC ¶ 93), and that while Mr. Johnson is aware of two police calls that occurred after Plaintiff's termination, Mr. Johnson believed that the representative acted appropriately and that the situation was markedly different from Plaintiff's interaction in that the customer was demonstrating threatening behavior, such as yelling, cursing, forcibly tapping the glass, and making threatening statements such as "if you're going to call the police, you need to call a SWAT team";



AO 72A
(Rev.8/82)

the representative attempted to calm the customer down before calling for police assistance; and when the police were engaged, the representative permitted the officer to address the situation as he or she saw fit and did not interfere, (SC ¶¶ 94-98; Pl. Resp. SC ¶¶ 94-98). Consequently, the Court finds no evidence of pretext in Plaintiff's suggestion that she followed the proper procedure during the customer interaction or that Mr. Johnson knew other customer service representatives engaged in similar conduct but treated them differently.

Finally, Plaintiff does not explain how the fact that other employees had "severe grievances" or that both Mr. Johnson and Ms. Pringle signed her termination notice lends any credence to the discrimination or retaliation claim she asserts here. [*See* Doc. 72 at 19, 22; Doc. 74 at 17-18, 21]. And while the Court has given Plaintiff the benefit of the doubt in presuming that Plaintiff's allegations—including her allegations regarding Ms. Pringle and Mr. Johnson's knowledge of her medical condition and putative protected conduct and regarding the temporal proximity of Plaintiff's termination to her Workplace Ethics complaint and her completion of the employee engagement survey—are sufficient to state a *prima facie* case of disability discrimination and retaliation, the Court is similarly unpersuaded that those allegations are sufficient to show that Defendants' proffered reason for Plaintiff's termination was



AO 72A
(Rev.8/8
2)

false and that discriminatory or retaliatory animus was the real reason for her termination.

For these reasons, the undersigned concludes that Plaintiff has failed to establish a genuine issue of material fact as to pretext. Accordingly it is **RECOMMENDED** that the District Judge **DENY** Plaintiff's motion for summary judgment on her claims of disability discrimination and retaliation, [Doc. 48], and that he **GRANT** Defendants' motions for summary judgment on the claims, [Docs. 43, 44].

***D. Other Claims and Arguments***

Defendants asserted myriad other arguments in support of their motions for summary judgment on the claims Plaintiff asserted under the ADA for failure to accommodate and for discriminatory and retaliatory termination. Because it is clear that summary judgment is warranted for the reasons set forth above, the Court need not—and therefore does not—address those additional arguments in this R&R.

Additionally, Defendants noted that Plaintiff made assertions in her complaint that, if liberally construed, might be deemed to raise claims for wrongful denial of FMLA leave, (Compl. ¶ 29), and discriminatory failure to assign Plaintiff's case to Georgia Power's Disability Management team, (*id*. ¶ 28), and, out of an abundance of caution, Defendants also argued that any such claims would be subject to summary



AO 72A
(Rev.8/8
2)

judgment. [Doc. 43-2 at 22-26; Doc. 44-2 at 11-12]. Plaintiff did not respond to the arguments. [*See* Docs. 72, 74]. Consequently, to the extent that the complaint could be construed to assert such claims, they are subject to Defendants' motions for summary judgment on grounds of abandonment. *See supra* Part IV.B. (discussing Plaintiff's abandonment of her ADA claims for failure-to-accommodate). In any event, Plaintiff admits that her FMLA leave was exhausted on May 28, 2014, (SC ¶ 50; Pl. Resp. ¶ 50), and there is no dispute that no disability case manager was assigned to Plaintiff's case because Plaintiff's doctor released her to work after only thirty days' leave and she therefore did not meet the case-management criteria, (SC ¶¶ 111-13; Pl. Resp. ¶¶ 111-13; P ¶ 55; GP Resp. ¶ 55; SC Resp. ¶ 55). Thus, to the extent that Plaintiff's complaint could be construed to assert an FMLA claim for wrongful denial of leave, (Compl. ¶ 29), or an ADA claim for Defendants' failure to assign Plaintiff's case to Georgia Power's Disability Management team, (*id.* ¶ 28), the undersigned **RECOMMENDS** that summary judgment also be **GRANTED** to Defendants on those claims.

## *V. Conclusion*

For the reasons discussed above, Plaintiff's motions for leave to file amended briefs are **GRANTED**, [Docs. 71, 73], and the undersigned **RECOMMENDS** that



AO 72A
(Rev.8/82)

Plaintiff's Motion for Summary Judgment be **DENIED**, [Doc. 48], and that Defendants' Motions for Summary Judgment be **GRANTED**, [Docs. 43, 44]. The Clerk is **DIRECTED** to terminate the referral to the undersigned.

**IT IS SO ORDERED, RECOMMENDED, and DIRECTED**, this the 9th day of December, 2016.

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**



AO 72A
(Rev.8/82)